Susan **CENTMEHAIEY**, Administratrix, the Estate of Michael James Emmons, Petitioner,

v.

**SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.**

No. 90–1450–V.

United States Court of Federal Claims.

Jan. 13, 1995.

---

Mario DiNatale, Stamford, CT, atty. of record, for petitioner.

Virginia A. Kozak, U.S. Dept. of Justice, Washington, DC, atty. of record, for respondent.

## OPINION

HORN, Judge.

Petitioner, Susan Centmehaiey, filed her claim for death benefits in the United States Court of Federal Claims[1] on October 26, 1990, alleging that her infant son, Michael James Emmons, died on September 24, 1973, as a result of a Diphtheria–Pertussis–Tetanus injection (hereinafter "DPT"), allegedly administered to the infant on September 23, 1973. The above-captioned case is before this court on respondent's motion for review of the special master's decision granting compensation to the petitioner under the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa–1–300aa–34 (West 1991) (hereinafter "Vaccine Act").[2]

### *PROCEDURAL BACKGROUND*

Subsequent to the initial filings in this matter, the special master held an evidentiary hearing on March 17, 1994, in New Haven,

---

1. Following the enactment of the Court of Federal Claims Technical and Procedural Improvement Act of 1992, Pub.L. No. 102–572, 106 Stat. 4506, the United States Claims Court was renamed the United States Court of Federal Claims.

2. Tit. XXI, § 2112, as added Nov. 14, 1986, Pub.L. No. 99–660, tit. III, § 311(a), 100 stat. 3761; Dec. 22, 1987, Pub.L. No. 100–203, tit. IV, §§ 4303(d)(2)(A), 4307(3), 101 Stat. 1330–222, 1330–224 and amended Dec. 22, 1987, Pub.L. No. 100–203, tit. IV, §§ 4303(d)(2)(A), 4307(3), 101 Stat. 1330–222, 1330–224 and amended Dec. 22, 1987, Pub.L. No. 100–203, tit. IV, §§ 4303(d)(2)(A), 4307(3), 101 Stat. 1330–222, 1330–224, Pub.L. No. 100–203, tit. IV, §§ 4307(3)(c), 4308, as amended and added July 1, 1988, Pub.L. No. 100–360, tit. IV, § 411(o)(2), (3)(A), 102 Stat. 808; Dec. 19, 1989, Pub.L. No. 101–239, tit. IV, § 6601(d)(i), 103 Stat. 2286–2290; Nov. 3, 1990, Pub.L. No. 101–502, § 5(b), 104 Stat. 1286; Nov. 26, 1991, Pub.L. 102–168, tit. II, § 201, 105 Stat. 1102; Oct 27, 1992, Pub.L. 102–531, tit. III, § 314, 106 Stat. 3508; June 10, 1993, Pub.L. 103–43, tit. XX, § 2012, 107 Stat. 122; Aug. 10, 1993, Pub.L. 103–66, tit. IV, § 13632, 107 Stat. 312; Dec. 14, 1993, Pub.L. 103–183, tit. VII, § 708.

Connecticut, which was continued on April 7, 1994, in Arlington, Virginia. The record from the hearing consists of testimony from family, a friend of the petitioner, and medical experts, as well as documentary evidence filed with the petition. The special master issued her ruling from the bench at the conclusion of the hearing on April 7, 1994, determining that petitioner had proven all facts necessary to establish entitlement to an award of death benefits compensation in the amount of $250,000.00. Subsequently, on July 20, 1994, the special master issued a written memorandum decision, which she characterized as a "brief summary" of her bench ruling, and which was intended to incorporate the ruling she had issued from the bench.

On August 19, 1994, respondent filed a motion for review, arguing that the special master had acted arbitrarily and capriciously when she found that a DPT injection had been administered to Michael James Emmons on September 23, 1973. Consequently, respondent argued that there should be no entitlement to death benefits in this case. Respondent maintains in its motion for review that the record lacks contemporaneous, medical documentation, or testimony, other than that of the mother, on whether the infant received a DPT vaccination on the date alleged. Moreover, respondent further claims that the record contains substantial evidence contradicting the testimony offered by the petitioner, the victim's mother, that the shot was administered on the date she alleged. Respondent seeks to have this court set aside the decision of the special master and direct that judgment be entered dismissing the petition. Petitioner filed a memorandum in response on October 17, 1994, claiming that the special master's decision to award compensation to the petitioner pursuant to the Vaccine Act was properly based on the preponderance of the evidence presented at the hearing, and that, therefore, the decision of the special master should be sustained.

### FACTUAL BACKGROUND

Petitioner, Susan Centmehaiey, gave birth to Michael James Emmons, by cesarean sec-

tion, on July 3, 1973, in Greenwich, Connecticut. Neither Michael nor the petitioner suffered any difficulties during the birth, and prior to the events leading to his death, Michael had no documented health problems. Michael did not exhibit any symptoms of illness, was not colicky, and had never experienced any prolonged bouts of crying.

On September 24, 1973, between 5:00 a.m. and 6:00 a.m., petitioner found Michael dead in his crib. The autopsy and Medical Examiner's office determined that death occurred between 2:00 a.m. and 6:00 a.m. on September 24, 1973, and that the cause of death was Sudden Infant Death Syndrome (SIDS). The Assistant Medical Examiner for the State of Connecticut reported that the baby, apparently, was in good health when he was put to bed the previous evening.

The Final Diagnosis on the Medical Examiner's report stated:

Sudden unexplained death at infancy

No anatomical cause of death

Petachial hemorrhages, visceral pleura

Pulmonary congestion

Petitioner alleges that the cause of death was a result of a reaction to a DPT vaccination Michael allegedly received on September 23, 1973, less than 24 hours before his untimely death. Respondent argues, however, that the record lacks sufficient evidence to establish that such a vaccination occurred on the date alleged. Robert Lee, M.D., of Greenwich, Connecticut, who allegedly administered the vaccination, is mentally incapable of testifying, and, despite diligent efforts by petitioner and her counsel, Dr. Lee's office records could not be located.

At the evidentiary hearing held before the special master, Michael's mother testified that she and Michael's father took Michael to see his pediatrician, Dr. Lee, on September 23, 1973. She further testified that Dr. Lee examined Michael and found that he was in good health and had gained weight since birth. Petitioner testified that she witnessed Dr. Lee administer a vaccination to Michael in his leg or thigh. She testified that she was informed by Dr. Lee that the shot was a DPT vaccination.

The father, Brian Emmons, testified that he took Michael, who according to his father at the time was in good health, to Dr. Lee's office the day before he died. Although the father recalled that Michael received a shot, he could not recall sufficient information to respond to a number of specific inquiries about the visit to the doctor on September 23, 1973, or about Michael's condition. For example, Mr. Emmons could not recall on what day of the week Michael received his shot, on what part of his body Michael received the shot, how long the office visit had lasted, any comments made by Dr. Lee regarding Michael's general health, whether or not Michael was a colicky baby, or whether Michael cried a lot. Michael's father testified that after Michael's doctor appointment, he drove Ms. Centmehaiey home and proceeded to go to work for the remainder of the day. Moreover, Michael's father testified, however, that the only reason he believes that the shot his son allegedly received on September 23, 1973 was a DPT vaccination is due to information he acquired during the litigation of the above-captioned case.

Petitioner, Susan Centmehaiey, provided testimony that after leaving Dr. Lee's office, she picked up her other son, Scott, and proceeded to visit the home of a friend, Elvira Rende. Ms. Centmehaiey testified that upon returning home from the doctor, a couple of hours after the doctor's visit, Michael began crying, and that the crying continued to get worse until he was screaming uncontrollably in a high-pitch. She testified that Michael cried all day, despite her efforts to comfort him, and that he would not eat or drink. Petitioner further testified that he continued crying that night, until about one or two in the morning, when he went to sleep. At the time he fell asleep, petitioner stated that Michael looked pale and that his body was limp.

Ms. Rende, the family's neighbor, provided testimony that the petitioner informed her that Michael had received a shot earlier that day and that when she witnessed Michael having his diaper changed that afternoon, she saw a little ring on his "little coolie," which she later defined as Michael's "rear end." Ms. Rende did not mention his thigh or leg. Ms. Rende further testified that on a later visit to petitioner's home that evening, she witnessed Michael's inconsolable crying and spent some time trying to rock and comfort him.

Initially, Ms. Centmehaiey could not recall the day of the week on which the child allegedly received the vaccine. Respondent, however, submitted uncontradicted evidence that September 23, 1973, the date Michael allegedly received the vaccination, fell on a Sunday. Respondent then presented testimony from Janet Staplefield, Dr. Lee's former office manager, who testified that Dr. Lee did not schedule appointments for office visits on Saturdays and Sundays, and only saw children on weekend days who required treatment on an emergency basis. She further testified that the administration of a first DPT vaccination to a child at two months of age was part of a routine visit which would not require an emergency office visit on a Sunday. Ms. Staplefield's testimony was corroborated by a declaration submitted by Margaret Wiggin, Dr. Lee's former nurse. Although Ms. Wiggin did not testify at the hearing in this matter, her declaration was read into the record at the hearing on April 7, 1994, in Arlington, Virginia.

Both petitioner and respondent presented expert, medical testimony at the hearing. Petitioner presented the expert opinion of Arthur M. Seigel, M.D., a pediatric neurologist, and Assistant Clinical Professor at Yale University School of Medicine. Prior to testifying, Dr. Seigel reviewed affidavits from Mr. Emmons, Ms. Centmehaiey, and Ms. Rende, as well as the limited documentary, medical records available in this case, including the autopsy report. Dr. Seigel testified that based upon the absence of prior symptoms, Michael's apparent previous good health, Michael's irritability, high-pitched screaming and constant crying prior to his death and based on the lack of any other "risk factor" or reasonable explanation for Michael's death, it was more probable than not that the alleged vaccination caused Michael's death. Stated otherwise, Dr. Seigel testified that Michael's "death was causally related to the DPT shot he had received."

All of Dr. Seigel's medical opinions presented to the special master were based on the presumption that Michael had received a DPT shot on September 23, 1973, although he agreed during his testimony that the record contained no documentary evidence that a DPT shot, in fact, had been administered to Michael on the alleged date. Dr. Seigel testified that:

> Well, the main symptoms [of encephalopathy] are alternation in mental status. His normal mental status for a child of his age was not present in that he was very irritable. His tongue was described as limp.[3] I don't know if that was included in your premise, but his mother said he was limp. I would say the change in muscle tone and the change in mental status are the main features.

On cross-examination, however, Dr. Seigel acknowledged that the symptoms of "crying inconsolably, a high-pitched scream and refusal to eat" might be consistent with the symptoms of colic, that an infant could be limp from exhaustion due to extended crying, and that although these symptoms were consistent with, they were not conclusive signs of, an encephalopathy.

On cross-examination, Dr. Seigel contradicted his earlier conclusions repeatedly. The following excerpt, albeit lengthy, is demonstrative regarding the lack of certainty and reliability of Dr. Seigel's medical conclusions in the above-captioned case:

> Q. [MS. KOZAK] Now, Doctor, if he had DPT encephalopathy as you've testified to, how did this encephalopathy cause Michael's death?
>
> A. [DR. SEIGEL] I don't think we know the answer to that question for sure.
>
> Q. Then how do you know that Michael's death was a result of the encephalopathy?
>
> A. Well, I didn't say I knew that. I don't think anybody knows that. I think what the question is: what we do know is that he's dead. He had a shot the day before and he got sick that night. And we don't have the rest of the data. So we have to use the data we do have to try to come to some logical conclusion, including an autopsy report that doesn't explain his death. And I think that given that data and just trying to apply some logic, I think that it's more likely than not that it was the shot.
>
> Q. Is it your opinion that he could not have colic on one day and die from SIDS the next?
>
> A. I think that's a stretch. I think that's a stretch.
>
> Q. So it would be your feeling that he could not?
>
> A. Well, it's statistically possible. I think it's unlikely.
>
> Q. Is it your opinion that he could not have had a reaction—assuming that he had this shot, that he could not have had a reaction to the shot, which included crying and refusal to eat, but did not—but then died from SIDS?
>
> MR. DiNATALE [defendant's counsel]: I'm sorry, I don't understand that question. Could I ask you to repeat that?
>
> MS. KOZAK: I'm sorry. Let me repeat that.
>
> Q. [MS. KOZAK] Is it possible that Michael could have had a temporary reaction from the alleged shot, which included crying and refusal to eat, and recovered from that and then died from SIDS?
>
> A. Again, I think that's possible but unlikely.
>
> Q. And why is it unlikely?
>
> A. Well, I think that what you're saying is a coincidence, and I just think that's statistically unlikely.
>
> Q. But isn't it true, Doctor, that the largest number of children who have died from SIDS die at approximately the same time as this first DPT shot is given, between the first and the second?
>
> A. Un-hum.
>
> Q. And isn't it also unlikely that they're going to be some children who receive DPT shots and then die from SIDS at the same time?

---

**3.** Although the mother testified that Michael appeared limp when put to bed, there was no testimony that his tongue was limp.

A. Yes, and they'll be kids who die the day after a rain storm, but that doesn't, you know, give you a causal relationship.

Q. How many cases—have you ever heard of any cases where there was a DPT-related encephalopathy which caused death within 24 hours of the DPT?

A. I've heard of one, but I've heard of it through another neurologist, and I don't know the case myself.

Q. Are you familiar with any in the literature?

A. I'm not sure; I'm not sure.

Q. And the other one was within 24 hours?

A. My understanding is that it was.

Q. Would you agree that it would have to be a severe encephalopathy to cause death so quickly?

A. I think you could say that, yes.

Q. And if an encephalopathy is so severe to cause death, would you expect to see evidence of cerebral edema?

A. Sometimes you do and sometimes you don't. It depends on the cause of death—I should say the cause of encephalopathy.

Q. And there wasn't any evidence of cerebral edema in the autopsy; is that correct?

A. Right.

Q. In this one case that you've heard of, are you aware of whether there was or was not a change—there was a neuropathological change?

A. I don't know that either.

Q. Do you, then, disagree with the diagnosis of SIDS?

A. You mean in this child?

Q. Right.

A. Well, the child had a sudden death, but I don't think it's SIDS, using the normal convention of SIDS, which as I said refers to an otherwise healthy child at night.

Q. Now you stated in your opinion that—this is dated November 19, 1993: "Michael probably developed an acute encephalopa-thy or possibly a seizure during the night which led to his demise."

A. Yes.

Q. Do you still hold this opinion that he possibly developed a seizure during the night?

A. It's possible, sure.

Q. Is there any evidence of it?

A. No.

Q. If there is no evidence of it, would you agree that it be speculative to say that there was a seizure?

A. Somewhat, yes.

Q. Is it correct that your opinion that the DPT caused Michael's death is based largely on a temporal sequence?

A. The temporal sequence, yes.

THE COURT: I'm sorry. I think I missed the question and the answer, at least the significance. Ask it again.

MS. KOZAK: I asked is his opinion that the DPT caused Michael's death was based on the temporal sequence.

THE COURT: All right, and your answer was—

THE WITNESS: Yes.

In response, the government presented expert testimony from Richard Young, M.D., a pediatric neurologist and Associate Clinical Professor of Pediatrics and Neurology, also at Yale University School of Medicine. Based on Dr. Young's review of the birth records, the medical examiner's report at death, the respondent's brief, the transcript of the depositions, and affidavits submitted by Michael's parents and the neighbor, Ms. Rende, Dr. Young concluded that Michael Emmons "did not have an acute encephalopathy which led to his death." Unlike Dr. Seigel, Dr. Young did not assume, prior to rendering his medical conclusions that Michael had received a DPT shot on September 23, 1973. Dr. Young based his opinion on the fact that on the night before Michael died, the child, ultimately, was consolable, put to bed, and went to sleep, without appearing to be in a comatose state.[4] Dr. Young stated

---

4. The court notes that the mother heard her son sigh during the night, and, apparently, not finding anything unusual, did not respond.

that "the Commission on Encephalopathy, founded by the American Medical Association, concluded that pertussis vaccine encephalopathy was characterized by generalized tonic/clonic seizures and states of decreased consciousness," but that Michael did not exhibit the classic symptoms associated with an encephalopathy, or any other vaccine-related injury. Dr. Young testified that the limpness and glassy-eyed state exhibited by Michael when he went to bed were less likely to have been neurological symptoms than signs of normal exhaustion, following extended crying. He also testified that the brain examination on autopsy was normal, and that he was aware of no cases in which infants died as rapidly as within 24 hours of receipt of a DPT from encephalopathy.[5] Based on the autopsy results and the medical examiner's report, as well as on his expertise as a pediatric neurologist, Dr. Young agreed with the conclusions in the autopsy report, within a reasonable degree of medical certainty, that Michael had died of Sudden Infant Death Syndrome. At the close of the direct testimony, Dr. Young testified:

Q. [MS. KOZAK] I can't remember whether I've asked you this, but based on the record in its entirety, including the evidence you heard at the hearing, do you have an opinion to a reasonable degree of medical certainty as to whether Michael had encephalopathy?

A. [DR. YOUNG] My opinion is that he did not. I'd like to jump amplify [sic] on that one more time, if I could. The key issue here hangs on what Michael was like when he was put in the cradle. Was he encephalopathic and unresponsive, or was he simply sleeping? I think that when parents come upon a parent or when I see a baby in the hospital I look at him. Now you have to look at a sleeping baby and decide: is this baby simply sleeping normally or is the baby comatose?

When you put a baby down to sleep, even though the baby is sleeping, it makes little movement. It coos. It has little sleep-like movements that all of us do during sleep. When you put somebody down

who's comatose, they don't move; and I think most parents can recognize whether a baby is sleeping because of these little movements or whether they're in a most abnormal state of consciousness, called encephalopathy, in which there's no movement whatsoever, the body hangs completely limp and there's no response at all to even being laid down. Generally, when you put an infant on a mattress, it moves a little bit and adjusts its position, and I think parents know somehow that when they put a baby down and there's no movement whatsoever, that this child is in a strange and abnormal neurologic state.

After hearing the testimony provided by all the witnesses, the special master issued her opinion from the bench. Subsequently, on July 20, 1994, the special master issued her findings in written, memorandum form, which she characterized as a "brief summary" of her ruling from the bench, incorporating her earlier bench ruling. The special master set forth the following findings of fact in her written opinion:

The court found credible the testimony of the fact witnesses placing the onset of symptoms of a Table-injury within a few hours of the vaccination, although that fact is not documented in the contemporaneous medical records. The court gave substantial weight to the testimony of Mrs. Elvira Rende, a neighbor, who was aware of the trip to the doctor on September 23, 1973, and invited the infant and his mother into her home after the vaccination. She saw the "little hole" of the needle puncture, observed during a diaper change as well as the onset of symptoms and their escalation. She testified that she was present in the Emmons' home that evening and personally observed the continuous, excessive, abnormal crying, the infant's refusal to feed, the fruitless call to the doctor, and Michael's condition when put to bed between 1:00 and 1:30 a.m. The child's condition, when last seen alive, is best described by his mother as pale, limp, and exhausted, awake, but "just barely," (Tran-

**5.** Dr. Seigel had testified that although he was not personally familiar with the case, he had heard of just one case in which there was a DPT-related encephalopathy which caused death within 24 hours of the DPT shot having been administered.

script of March 17, 1994 at 115) his eyes in a daze—"and it seemed like they were rolled back, out of focus for a second."[1] *Id.* at 118. The child was found dead at approximately 6:00 a.m. on September 24, 1973. The autopsy diagnosis was Sudden Infant Death syndrome (SIDs).

Based on the credibility of the witnesses and the well reasoned and persuasive opinion testimony of Dr. Arthur M. Seigel, Assistant Clinical Professor of Pediatrics in Neurology at Yale University medical school, the court found, by a preponderance of the evidence, that Michael Emmons' death was more likely the result of a Table-injury, namely a vaccine-related encephalopathy, leading to death.

[1] The child's face was described as "flushed" or "red" as a result of severe crying, but when the crying stopped, he was described as "pale."

Based on her findings of fact, the special master concluded: "petitioner has proved all facts necessary to establish a vaccine-related injury and death. All statutory requirements have been satisfied, and petitioner is entitled to the amount of $250,000 for the unfortunate death of her infant son." After a thorough review of the record and filings in the above-captioned matter, as discussed more fully below, this court concludes, however, that Susan Centmehaiey is not eligible to receive compensation for the death of her son, Michael Emmons, pursuant to the Vaccine Act. The decision of the special master was arbitrary, capricious and not in accordance with the law. Therefore, the decision of the special master should be overturned and the petition should be dismissed.

### DISCUSSION

When deciding a motion to review a special master's decision, the judges of this court shall:

(A) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,

(B) set aside any findings of fact or conclusions of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law and issue its own findings of fact and conclusions of law, or,

(C) remand the petition to the special master for further action in accordance with the court's direction.

42 U.S.C. § 300aa–12(e)(2).

As stated in the legislative history of the Vaccine Act:

> The conferees have provided for a limited standard for appeal from the [special] master's decision and do not intend that this procedure be used frequently but rather in those cases in which a truly arbitrary decision has been made.

(citing H.R.Conf.Rep. No. 386, 101st Cong., 1st Sess. at 512–13, 517, *reprinted in* 1989 U.S.Code Cong. & Admin.News 1906, 3115, 3120).

Although review by the judges of this court of decisions issued by the special master should be conducted within the bounds described above, 42 U.S.C. § 300aa–12(e)(2) dictates that the judges of this court should utilize differing and distinguishable standards of review, depending upon which aspect of the case is under scrutiny. As stated by the United States Court of Appeals for the Federal Circuit:

> These standards vary in application as well as degree of deference. Each standard applies to a different aspect of the judgment. Fact findings are reviewed by us, as by the Claims Court judge, under the arbitrary and capricious standard; legal questions under the 'not in accordance with law' standard; and discretionary rulings under the abuse of discretion standard. The latter will rarely come into play except where the special master excludes evidence.

*Munn v. Sec'y DHHS*, 970 F.2d 863, 870 n. 10 (1992). Adopting these guidelines, the judge in *Cox v. Sec'y DHHS* likewise wrote:

> Each standard articulated in 42 U.S.C. § 300aa–12(e)(2)(B) applies to a different aspect of the special master's decision. The court evaluates findings of fact under the 'arbitrary and capricious standard'; legal conclusions under the 'not in accordance with the law standard'; and discretionary rulings under the 'abuse of discre-

tion standard.' *See Munn v. Sec'y DHHS,* 970 F.2d 863, 870 (Fed.Cir.1992).

*Cox v. Sec'y DHHS,* 30 Fed.Cl. 136, 142 (1993); *see also Perreira v. Sec'y DHHS,* 27 Fed.Cl. 29, 31 (1992).

█ The arbitrary and capricious standard of review is a narrow one. *Johnston v. Sec'y DHHS,* 22 Cl.Ct. 75, 76 (1990). *See Cucuras v. Sec'y DHHS,* 993 F.2d 1525, 1527 (Fed. Cir.1993); *Estate of Arrowood v. Sec'y DHHS,* 28 Fed.Cl. 453, 457 (1993); *Bradley v. Sec'y DHHS,* 991 F.2d 1570, 1574 (Fed. Cir.1993); *Perreira v. Sec'y DHHS,* 27 Fed. Cl. 29, 32 (1992). When applying the arbitrary and capricious standard, a reviewing court is not empowered to substitute its own judgment for that of a previous trier of fact. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971). Instead, when determining whether a decision was arbitrary and capricious, a court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* Furthermore, "[i]f the special master has considered the relevant evidence in the record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Hines v. Sec'y DHHS,* 940 F.2d 1518, 1528 (Fed.Cir.1991). *See Lewis v. Sec'y DHHS,* 26 Cl.Ct. 233, 236 (1992); *Murphy v. Sec'y DHHS,* 23 Cl.Ct. 726, 729–30 (1991). Thus, the decision of a special master may be found to be arbitrary and capricious only if the special master:

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence ... or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Hines,* 940 F.2d at 1527 (quoting *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

Moreover, according deference to the special master's decision requires that the reviewing court "may not substitute its own judgment for that of the special master if the special master has considered all relevant factors, and has made no clear error of judgment." *Lonergan v. Sec'y DHHS,* 27 Fed.Cl. 579, 579–80 (1993); *Perez v. Sec'y DHHS,* 27 Fed.Cl. 200, 201 (1992) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971); *Hyundai Elecs. Indus. Co. v. United States Int'l Trade Comm'n,* 899 F.2d 1204, 1209 (Fed.Cir.1990); *Gamalski v. Sec'y DHHS,* 21 Cl.Ct. 450, 451–52 (1990)).

Although the arbitrary and capricious standard is widely used, there is no uniform definition of this standard. In *Hines v. Sec'y DHHS,* however, the court has accumulated, and offered as guidance, a wide variety of examples in which the arbitrary and capricious standard has been applied:

> 'an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise,' *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983) (review of agency rule making); agency must articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made,' *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962) (review of agency adjudication); 'proof that there was 'no reasonable basis' for the administrative decision will also suffice [to show arbitrary and capricious conduct], at least in many situations,' *Prineville Sawmill Co., Inc. v. United States,* 859 F.2d 905, 913 (Fed.Cir.1988) (quoting *Keco Ind., Inc. v. United States,* 492 F.2d 1200, 1203–04, 203 Ct.Cl. 566 (1974) (review of preaward bid protest action against letting of government contract); reviewing court must "guard against an agency's drawing inferences that are 'arbitrary' in relation to the facts

found, no matter how substantial may be the support for those facts," *Midtec Paper Corp. v. United States,* 857 F.2d 1487, 1498 (D.C.Cir.1988) (review of agency adjudication); 'the central focus of the arbitrary and capricious standard is on the rationality of the agency's 'decision-making,' rather than its actual decision,' *United States v. Garner,* 767 F.2d 104, 116 (5th Cir.1985); 'whether the decision was based on a consideration of relevant factors, whether there has been a clear error of judgment and whether there is a rational basis for the conclusions ...,' *Mobile Oil Corp. v. Department of Energy,* 610 F.2d 796, 801 (Temp.Emer.Ct.App.1979, *cert. denied,* 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980) (review of agency rulemaking) (quoting *Texaco, Inc. v. Federal Energy Admin.,* 531 F.2d 1071, 1076–77 (Temp.Emer.Ct.App.1976)).

*Hines v. Sec'y DHHS,* 940 F.2d at 1527–28.

■ Compensation under the Vaccine Act is determined pursuant to the statutory guidelines set out in the Vaccine Act. According to the Act, a petitioner, in this case the mother as legal representative of the deceased, is entitled to compensation only if the petitioner can show, by a preponderance of the evidence, that the case presented meets the multiple criteria specified in the Vaccine Act. 42 U.S.C. § 300aa–13(a)(1)(A). In the context of a Vaccine Act case, the preponderance of the evidence standard has been explained as more than a probability. The special master must "believe that the existence of a fact is more probable than its nonexistence, before the [special master] may find in favor of the party who has the burden to persuade the [special master] of the fact's existence." *Ciotoli v. Sec'y DHHS,* 18 Cl.Ct. 576, 588 (1989) (quoting *In re Winship,* 397 U.S. 358, 371, 90 S.Ct. 1068, 1076, 25 L.Ed.2d 368 (1970) (Harlan, J. concurring)) (quoting F. James Civil Procedure 250–1 (1965)).

■ The Vaccine Act also clearly states that the special master may not find for the petitioner based on the claims of the petitioner alone, unsubstantiated by medical records or medical opinion. 42 U.S.C. § 300aa–13(a)(1). The lack of contemporaneous, documentary proof of a vaccination, however, does not necessarily bar recovery. *See Brown v. Sec'y DHHS,* 18 Cl.Ct. 834, 839 (1989), *rev'd on other grounds,* 920 F.2d 918 (1990).

■ In the instant case, the first of the relevant statutory requirements is that the infant suffering the injury must have received one of the vaccines listed in the Vaccine Injury Table (Table) which appears at 42 U.S.C. § 300aa–14. Petitioner in the instant case alleges that her son, Michael, received a DPT (Diphtheria, Pertussis, Tetanus) vaccination on September 23, 1973, and DPT is a vaccine recognized as compensable by the the Vaccine Injury Table.

Fundamental to the decision to award death benefits arrived at by the special master in the above-captioned case, however, were her findings of fact that Michael Emmons, indeed, had received a DPT vaccination, and had received it on September 23, 1973. In both her written and bench rulings, the special master acknowledged that the administration of the vaccination to Michael was not documented in the contemporaneous records. In her bench ruling, the special master offered the following defense of her finding that a DPT vaccination had occurred, although she did not address the issue in her written memorandum:

THE COURT: These are findings of fact: that Michael Emmons was born on July 3, 1973. The birth was apparently without complication, and the child was apparently healthy and well until approximately the age of two months, when he was taken for his first DPT vaccine. That was administered in the United States, and both Petitioner and the child's father happened to be present and witnessed the administration of the vaccine.

I'm going to have to explain why I find that that happened. The fact of the vaccination is based not only on the testimony of the Petitioner since there is nothing in the medical records, but I'm basing it also on the very highly credible and highly persuasive testimony of the neighbor—I have forgotten her first name, but her last name is Rende—who observed the family returned home from the doctor's office;

was told that they had been to the doctor's office; was told that the child had received the vaccination at that time; and who personally observed the site of the vaccine and the puncture mark when the baby's diaper was changed.

Now I will have to agree that there is some question raised about the credibility of the fact witnesses because of the issue of the day of the week, and there is a question about whether it could possibly have been on a Sunday, as that date seems to fall out. The Court acknowledges that the administration of a vaccine is a fairly routine procedure and is usually performed during regular office hours and not usually on a Sunday.

The following factors are pertinent. First of all, the father accompanied the family to the doctor; that is, mother and baby. Now he worked regular hours and was also on call at other times. Weekends were the only times when he would have been available to go, unless he'd taken time off from work. So I'm considering that.

Moreover, Ms. Rende was at home, next door to the family, when they came home from the doctor's office. Now that could have been expected only on weekends because she worked at the school as a nurse—not as a nurse, but as a cook. So she would only have been home at that time of day on a Saturday or Sunday, and her school-aged daughter was also at home. She would not have been home had this occurred on a weekday.

There's also evidence that the doctor did see patients on Saturdays or Sundays, although according to the evidence in the record, his usual practice would have been to see only sick children on those days. So the Respondent has indeed raised some questions, but has not established that it could not possibly have happened.

For example, Dr. Young points to the fact that his child was already past time for his two-month checkup. That means that there was some urgency. It is very possible that that fact and the fact that Mom and Dad could not get the baby there on time could have—and this is specula-tion—could have suggested one reason why the doctor would be willing to give a vaccination on a Sunday. But Respondent has established that it would be highly unusual, and the Court acknowledges that fact. But Respondent has not ruled out the possibility that it could happen; the Court, having believed that there is a preponderance of the circumstantial evidence that the vaccine was given.

There is also very strong evidence that the vaccine was given within hours of the reaction itself; and the Court again relies very heavily and gives a great deal of weight to the testimony of Ms. Rende, who was an usually [sic] persuasive witness. Her English was not very good. She was very expressive, but I saw no evidence of dissembling or fraud in anyway.

She was not entirely accurate in all of her memories, but in the important areas, she was very persuasive. She described the events occurring within close temporal relationship to each other: the return home from the vaccination; the beginning of the reaction, which she actually saw herself when they had come up for coffee. She was an eye witness. In good conscience, I just cannot cast away the persuasive testimony as being fabricated; not by her, nor by the parents themselves, and certainly not just because of the unusual fact that vaccination—if it were on the date alleged—would have to have been on a Sunday.

But the Court finds that on whatever day it occurred, I find by a preponderance of the evidence a great deal more than that: that the events that were described by the fact witnesses occurred within very close temporal relationship to the vaccination.

Respondent argues in its motion for review that the special master acted arbitrarily and capriciously when she determined that petitioner had proven, by a preponderance of the evidence, that Michael, in fact, had received a DPT vaccination on September 23, 1973. Respondent also maintains that the petitioner bears the burden of proof to demonstrate that the vaccine was administered, and that contrary to the special master's opinion, it is

not the duty of the respondent to prove that the vaccination did not take place on a Sunday, or on any other day. Petitioner Centmehaiey argues, however, that the preponderance of the evidence standard does not require a scientific certainty and cites to a number of cases to show that the fact of a vaccination may be established by lay testimony, in the absence of documentary evidence, or even just by testimony offered by the parents in the case of the deceased.

It is undisputed in the above-captioned case that no contemporaneous medical records can be found to establish that Michael received a DPT shot on September 23, 1973. Nor is it possible to solicit testimony from the, now incapacitated, administering physician, Dr. Lee. Although there is precedent to support the proposition that a court may base a finding of fact that a vaccine was administered on lay testimony, the cases do not justify the special master's conclusions in the instant case. For example, in *Brown v. Sec'y DHHS*, 18 Cl.Ct. 834 (1989), *rev'd on other grounds*, 920 F.2d 918 (1990), the court found that a vaccination had occurred based on evidence of the parent's testimony, the mother's personal calendar and the physician's billing statement for medical services, including a charge for the vaccine in question, together with the mother's testimony; in *Berry v. Sec'y DHHS*, No. 90–339V, 1990 WL 293448 (Cl.Ct.Spec.Mstr., November 15, 1990), the testimony that a vaccine had been administered was corroborated in the hospital records; in *Taylor v. Sec'y DHHS*, No. 90–857V, 1991 WL 115031 (Cl.Ct.Spec.Mstr. June 12, 1991), the testimony of a vaccination was corroborated in a baby book; in *Wonish v. Sec'y DHHS*, No. 90–667V, 1991 WL 83959 (Cl.Ct.Spec.Mstr., May 6, 1991), the parental testimony was corroborated by medical records referring back to the DPT shot; and similarly, in *Alger v. Sec'y DHHS*, No. 89–31V, 1990 WL 293408 (Cl.Ct.Spec.Mstr., March 14, 1990), the finding that a vaccination had occurred was supported by testimony from the mother and from the doctor who administered the vaccination, and who was the infant's regular treating physician. In the instant claim, no similarly persuasive testimony or documentation has been offered.

Certain facts appear to be established clearly by the record currently before this court. There is no documented evidence that a vaccination was administered on September 23, 1973, and there is no disagreement that Michael died on September 24, 1973, which petitioner alleges was the day following administration of the vaccine to her son. Moreover, respondent has presented uncontradicted evidence that the day before Michael died, September 23, 1973, was a Sunday. It is also apparent from the record that Dr. Lee, normally, did not administer DPT vaccinations or conduct routine examinations on Sundays, and that a first DPT shot was generally administered by Dr. Lee during a two-month checkup, which was considered a routine visit.

In her bench ruling, the special master acknowledged that "the administration of a vaccine is a fairly routine procedure and is usually performed during regular office hours and not usually on a Sunday." The special master also acknowledged in her bench ruling that the respondent's introduction of evidence that the doctor's usual practice was to see only sick children on Sundays "has indeed raised some questions, but has not established that it could not possibly have happened." The special master, however, by her own admission, launched into speculation. She conjectured that since the infant may have been overdue for the two-month checkup, and since testimony was presented to indicate that the parents had some difficulty bringing their son in for an appointment during the week, perhaps the doctor may have been willing to administer the vaccination on a Sunday. After further acknowledging that it would have been highly unusual for the vaccination to have been administered on a Sunday, the special master, nonetheless, concluded: "[B]ut Respondent has not ruled out the possibility that it could happen; the Court, having believed that there is a preponderance of the circumstantial evidence that the vaccine was given."

Not only is the special master's admitted speculation that the vaccination was scheduled on a Sunday because the infant may have been overdue for his vaccination, and because the parents could not bring the child

to the doctor on weekdays, unsupported in the record, it is also contrary to the credible evidence. Until she was cross-examined by respondent's counsel, Ms. Centmehaiey appears not to have focused on the fact that September 23, 1973 was a Sunday. Moreover, petitioner testified, before being informed that the date in question was a Sunday, that Michael was in good health. Furthermore, both Ms. Centmehaiey and Brian Emmons testified that Brian was able to take off from work in the morning to take them to visit the doctor.

For proof that a DPT vaccine was administered to Michael on September 23, 1973, the day before he died, the special master appears to rely most heavily on the testimony of petitioner, Susan Centmehaiey, and her friend, Elvira Rende.[6] Petitioner, Ms. Centmehaiey, testified she witnessed Michael receive a shot, which she alleged the administering doctor told her was a DPT shot. The special master also relied on testimony from petitioner and from Ms. Rende, describing their recollection of the infant's behavior during the afternoon and evening following the alleged shot.

■ Petitioner correctly asserts that witness credibility is primarily within the purview of the special master as the trier of fact, and that the special master's determinations of credibility should be given appropriate deference since she had the opportunity to listen to the testimony, to ask questions of the witnesses, and to observe their demeanor. *Richardson v. Sec'y DHHS*, 23 Cl.Ct. 674, 678 (1991). The special master concluded that she saw no evidence of fraud in Ms. Rende's testimony and that she cannot disregard her persuasive testimony as being fabricated. The special master, however, noted in her bench ruling that Ms. Rende's english was not very good, and also conceded that she "was not entirely accurate in all her memories." According to the record, Ms. Rende did not see a shot administered and

only could testify that the petitioner had told her that Michael had received a "booster shot." The special master never addressed the fact that Ms. Rende was not present at the time of the vaccination, and that Ms. Rende was relying on the word of the mother to verify that a vaccination had been administered on September 23, 1973. As a result, even with the testimony of Ms. Rende and of the father, the only evidence, medical or lay, documentary or verbal, that a shot which contained the DPT vaccine was administered to Michael on September 23, 1973, the date alleged by petitioner, is the testimony of the petitioner mother.

The Vaccine Act specifically provides that the petitioner must prove the matters required to be included in the petition by a preponderance of the evidence. § 300aa–13(a)(1). The preponderance of the evidence standard requires the petitioner to "adduce evidence that makes the existence of a contested fact more likely than not." *Arrowood v. Sec'y DHHS*, 28 Fed.Cl. 453, 458 (1993) (quoting *McClendon v. Sec'y DHHS*, 23 Cl. Ct. 191, 195 (1991) (citing Black's Law Dictionary 1064 (5th ed., 1979)). Relying on mere speculation that the doctor could have scheduled a routine appointment on a Sunday, that it was hard for the parents to go to the doctor on a weekday and that the infant may have been overdue for his DPT vaccination, while accepting the uncorroborated evidence of the petitioner mother that the DPT vaccine was administered, is contrary to the Vaccine Act's requirement that the petitioner establish that the occurrence of the DPT vaccine administration be more probable than its nonexistence. Petitioner has not met her burden of proof in this regard, and has failed to prove by a preponderance of the evidence that Michael Emmons received a DPT vaccination on September 23, 1973.

■ Although this petitioner's claims must fail because there is insufficient proof in the record that a DPT shot was administered to

---

6. In neither her written nor bench ruling does the special master cite to the father's testimony for proof that Michael received a DPT shot on the date alleged. The court notes that although the father testified that he "recalled" that Michael had received a shot, he only learned that it was a DPT shot during the ongoing litigation.

Moreover, the father's recollection of the facts surrounding the office visit to the doctor were clouded. He could not remember much about Michael's general condition at the time, into what part of Michael's body the shot was administered, how long the office visit lasted or any comments made by Dr. Lee.

Michael on September 23, 1973, even assuming that there was adequate proof in the record that the DPT shot had been administered to the infant, the court also questions the special master's conclusions that an encephalopathy caused Michael's death. Respondent's medical expert, Dr. Young, provided a well reasoned and supported conclusion that Michael Emmons did not exhibit signs of encephalopathy, or die from a vaccine related injury. The special master only addresses the specifics included in the testimony of Dr. Young, respondent's medical expert, very briefly. She, however, applauds the "well reasoned and persuasive opinion testimony of Dr. Arthur M. Seigel," as the basis for her conclusion that Michael Emmons' "death was more likely the result of a Table Injury, namely, a vaccine-related encephalopathy, leading to death."

Upon review of the record, in the opinion of this court, however, Dr. Young, who at the time of his testimony was an Associate Clinical Professor of Pediatrics at Yale University School of Pediatrics at Yale University School of Medicine, the same Medical School which employed Dr. Seigel, provided for more credible evidence regarding the events leading up to Michael Emmons' death. Dr. Young concluded that Michael Emmons "did not have an acute encephalopathy which led to his death." He testified that because Michael had been consolable prior to being put to bed, and appeared to have gone to sleep, the limpness, paleness and glassy-eyed condition he exhibited prior to falling asleep were less likely to have been neurological symptoms of an encephalopathy, than signs of the exhaustion attributable to continuous crying. After reviewing the autopsy and the factual assertions offered by petitioner's witnesses, Dr. Young agreed with the medical examiner that Michael had died of Sudden Infant Death Syndrome.

Although the court readily acknowledges that the trier of fact, who can observe a witness during testimony, generally, is in the best position to determine credibility, in the instant case, the record, including the extensive quotations from Dr. Seigel's testimony, demonstrates the inconclusive nature of and the flaws in Dr. Seigel's conclusions. Dr. Seigel admitted that an infant could be limp from exhaustion due to extensive crying, and that the symptoms identified were consistent with, but not conclusive of, encephalopathy. Moreover, additional answers offered by Dr. Seigel, including his conclusion "that the DPT caused Michael's death was based on the temporal sequence," and Dr. Seigel's admission that he did not know whether Michael died as a result of an encephalopathy, but he thought that it was the logical conclusion, force this court to conclude that petitioner has failed, by a preponderance of the evidence, to prove that even if Michael had received a DPT shot the day before his death, Michael's death was caused by an encephalopathy.

## CONCLUSION

For all the foregoing reasons, this court finds that the special master's conclusions which allowed her to award compensation to this petitioner were arbitrary, capricious and not in accordance with the law. Although the circumstances surrounding Michael's death are tragic, the statutory provisions of the Vaccine Act do not permit compensation to a petitioner presenting the facts of the case currently before the court. Therefore, the respondent's motion for review is granted, the special master's holding is reversed, and this court finds that the petitioner is not eligible to receive compensation for the death of Michael James Emmons under the provisions of the Vaccine Act. The petition is, hereby, **dismissed.**

**IT IS SO ORDERED.**