Lori L. GURR and Russell Gurr, Natural Parents and Survivors of Curtis Gurr, Deceased, Petitioners,

v.

SECRETARY OF HEALTH AND HUMAN SERVICES, Respondent.

No. 90–2888V.

United States Court of Federal Claims.

Jan. 17, 1997.

Joseph J. Mellon, Denver, Colorado, for petitioners.

Kate Adam Coleman, with whom were Assistant Attorney General Frank W. Hunger, Helene M. Goldberg, Director, Torts Branch, John Lodge Euler, Deputy Director, and Eleanor A. Barry, Washington, D.C. for respondent.

## OPINION

ROBINSON, Judge:

This case is before the court on petitioners' July 23, 1996, Motion for Review of the special master's June 24, 1996, Dismissal Order cited herein as *Gurr v. United States*, No. 90–2888V, slip op. (Fed.Cl.Spec.Mstr. June 24, 1996) (*"Gurr* slip op."). This Dismissal Order affirmed the special master's October 19, 1995, bench ruling. Respondent filed a memorandum in response on August 22, 1996. Oral arguments were heard on January 13, 1997. For the reasons set forth below, the special master's decision is AFFIRMED.

### Background

Lori L. and Russell Gurr, petitioners, the natural parents and survivors of Curtis Gurr, filed a petition for compensation under the National Childhood Vaccine Injury Act,[1] 42 U.S.C. § 300aa–1 *et seq.* (1988 & Supp. IV 1992) ("Vaccine Act"), as amended, for the death of their son. Curtis was born on June 22, 1988. The pregnancy and delivery were unaccompanied by any complications. Curtis was a colicky[2] baby who was developing normally. On August 18, 1988, Curtis received his first diphtheria-pertussis-tetanus ("DPT") vaccination. Petitioners alleged that within 72 hours of the administration of the DPT vaccine, Curtis suffered an encephalopathy, which ultimately resulted in his death on August 29, 1988. One week prior to his death, Curtis started day care and was also weaned from breast feeding. Then on August 29, 1988, Curtis was found face down in his day care crib in vomitus. He was blue, and his hands clenched the bed sheets. His babysitter, Twyla Rasmussen, testified that Curtis seemed healthy and happy earlier that day. Despite the efforts of the staff at the emergency room, Curtis could not be revived. The emergency room report stated that Curtis was healthy prior to his death, that there was no evidence of recent trauma or related symptoms, and that sudden infant death syndrome ("SIDS") was the cause of Curtis' death. An autopsy report concluded that Curtis' death was consistent with SIDS and that there was "no evidence that trauma, neglect, infection, or congenital abnormalities played a role in the child's demise." Pet'rs' Ex. 11 at 8; *see Gurr* slip op. at 1–3.

On October 1, 1990, petitioners filed a petition under the Vaccine Act claiming that they were entitled to a presumption of causation given the proximity of Curtis' death to vaccine administration. On April 8, 1994, respondent filed a report recommending that no compensation be awarded in this case. The special master found that the medical records submitted by petitioners conflicted with petitioners' affidavits and testimony concerning the symptoms alleged to have occurred within the vaccine table's time frame[3] for the onset of encephalopathy. Respondent, therefore, contended that the evidence was insufficient to support petitioners' claim. The special master held an evidentiary hearing on October 19, 1995, in Denver, Colorado. The scope of this hearing was limited to the factual issue of whether the onset of symptoms alleged by petitioners occurred within 72 hours of vaccination. At the close of this hearing the special master ruled from the bench that petitioners had

---

1. 42 U.S.C. §§ 300aa–1 to –34 (1988) (codified as amended at 42 U.S.C.A. § 300aa–1 to –34 (West Supp.1994)). For clarity, codified sections of the Vaccine Act are cited herein without reference to "42 U.S.C. § 300aa–."

2. "Colicky" is the adjective form of "colic," acute gastrointestinal pain in infants accompanied by crying and irritability, resulting usually from gas in the alimentary canal, emotional dis-

tress, and/or overfeeding. STEDMAN'S MEDICAL DICTIONARY 326 (25th ed.1990).

3. The Vaccine Injury Table sets forth the types of vaccines, medical conditions, and corresponding time periods following vaccination within which onset must occur for petitioners to be entitled to presumptive causation and compensation. 42 U.S.C. § 300aa–14.

failed to meet their burden of proof with respect to the alleged occurrence of a vaccine table injury. Further, the special master determined that petitioners' theory of presumptive causation was rendered moot by his October 19, 1995, ruling and, therefore, that the opinion of petitioners' medical expert no longer had any legal significance. Petitioners were then given time to contemplate pursuing the case via causation-in-fact, which would require a showing that Curtis' death was proximately caused by DPT vaccination.

A status conference was held on January 16, 1996, at which petitioners asserted that the opinion of their medical expert was based upon a finding of onset of table injury and that they were unable to find a qualified medical expert who could substantiate a cause-in-fact claim. Respondent moved to dismiss petitioners' claim. This motion was granted and the status conference was concluded. Subsequently, petitioners' motion for an emergency status conference was granted, whereupon their request that execution of the special master's dismissal order be stayed for thirty days was granted to allow petitioners time to study the matter further. On January 17, 1996, the special master ordered petitioners to show cause as to why the case should not be dismissed and whether petitioners would pursue a cause-in-fact case. Petitioners filed a response to the order to show cause and a motion for reconsideration on February 15, 1996, to which respondent filed no opposition. Petitioners attached a second affidavit from their medical expert, Dr. Hart Peterson, to their response. Although not raised at the evidentiary hearing, petitioners asserted that the special master had overlooked relevant evidence contained in the medical records that corroborated petitioners' testimony. Upon consideration of petitioners' response and motion, the special master found that the cited evidence was insufficient to establish a table encephalopathy, death as a sequela within 11 days, or causation-in-fact. Thus, on June 24, 1996, the special master affirmed via dismissal order his bench ruling that petitioners had not proven a table injury within 72 hours of DPT vaccination followed within 11 days by death as a sequela, 42 U.S.C. § 300aa–11(c)(1)(C)(i), and that peti-

tioners still had been unable to produce a qualified medical expert who could testify that DPT vaccination was the cause-in-fact of Curtis' death. Accordingly, having determined that petitioners could not show cause, the special master dismissed the case pursuant to Vaccine Rule 21. *Gurr* slip op. at 6. On July 23, 1996, petitioners' filed a motion for review in this court seeking relief from the special master's dismissal order.

## Contentions of the Parties

Petitioners challenge the special master's reliance on two medical records, the emergency room ("ER") report and the autopsy report. They contend that reliance upon these medical records as the basis for finding that contemporaneous medical records contradicted petitioners' testimony and drawing conclusions of law therefrom was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See* 42 U.S.C. § 300aa–12(e)(2)(B). Petitioners maintain that the special master improperly relied on hearsay in the form of medical records to support his dismissal order. According to petitioners, although there are no contemporaneous medical records to corroborate their testimony that Curtis had lost weight while his head circumference increased, would have spells of stiffening accompanied by unusually high-pitched screams, and was suffering from what they now characterize as classic symptoms of a seizure (although they were originally believed to be temper tantrums or anger), Curtis was indeed suffering from contemporaneous medical problems prior to his death, which comprise evidence of the onset of encephalopathy within 72 hours of the DPT vaccination. These circumstances, petitioners insist, are consistent with the requirements of 42 U.S.C. § 300aa–14(b)(3)(A), which set forth the manifestations of encephalopathy. Further, petitioners argue that the conclusion of the autopsy report that Curtis died of SIDS is not inconsistent with a finding of table injury onset.

Petitioners contend that there was sufficient evidence to support a finding of causation-in-fact, and that the special master's dismissal of petitioners' causation-in-fact claim

was procedurally incorrect since the scope of the October 19, 1995, hearing was limited to the issue of onset of a table injury. They assert that the special master's conclusion that petitioners were unable to show cause or to produce a qualified medical expert to substantiate a cause-in-fact claim overlooked that petitioners had met their burden of proof and was, therefore, erroneous. That is, petitioners believe that they have supplied a competent, reputable medical/scientific explanation that establishes a logical sequence of cause and effect leading from the DPT vaccination to Curtis' demise, and that, therefore, they are entitled to compensation notwithstanding the special master's dismissal of their claim. In sum, the special master's disregard of and failure to consider relevant evidence, argue petitioners, constitutes an irrational and clearly erroneous exercise of judgment that should be reversed by this court.

Respondent counters that the special master gave all relevant evidence due consideration and that he correctly concluded that no table injury occurred within 72 hours of the vaccination. Despite petitioners' contentions, respondent claims that there are in fact contemporaneous medical records that conflict with petitioners' testimony and that they were carefully studied by the special master. Even if these records constituted hearsay—out of court statements offered to prove the truth of the matter asserted—it is well established, as noted by the special master, that the rules of evidence and corresponding objections are relaxed in vaccine cases to promote a freer discourse. The records at issue include the pediatrician's documents, the ER report, the autopsy report, and the records of the Colorado SIS Program's SIDS counselors. Respondent questions the credibility of petitioners' "dramatic testimony concerning Curtis' symptoms" considering his actual and alleged medical histories and given the thoroughness of these medical records. Respondent also challenges petitioners' so-called "objective evidence," arguing that it is unreliable and does not satisfy their burden of proof. Respondent maintains that the special master did not err in concluding that the medical records were consistent with each other but, for the most part, did not corroborate the intense testimony of petitioners.

Respondent asserts that there is insufficient evidence to support a finding of causation-in-fact. The opinion contained in the affidavit of petitioners' medical expert, contends respondent, is conclusory, unsupported by more reliable and qualified medical experts, and highly questionable. Respondent points out that it is even more disconcerting that Dr. Peterson relied on petitioners' testimony in forming his expert opinion—the same testimony his medical opinion was supposed to corroborate independently. Thus, according to respondent, the special master properly rejected Dr. Peterson's medical opinion, the cornerstone of petitioners' case, as being unpersuasive and unsupported by either objective factual findings or a credible medical/scientific explanation.

## DISCUSSION

### I. *Standard of Review*

Section 300aa–12(e)(2)(B) of the Vaccine Act provides that this court may not set aside the decision of a special master unless it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Review of a special master's decision is intended to be an extraordinary event rather than a matter of course. *Hale v. Secretary of HHS*, 22 Cl.Ct. 403, 406 (1991). *See also* H.R.Conf.Rep.No. 101–386. 101st Cong., 1st Sess., at 517 (1989), *reprinted*, 1989 U.S.C.C.A.N. 1906, 3018, 3120. Not only do the special masters have broad discretion to weigh the probative value of evidence and testimony, but once they have made their findings of fact they are considered "virtually unreviewable" by this court. *Bradley v. Secretary of HHS*, 991 F.2d 1570, 1575 (Fed.Cir. 1993). Indeed, in order to establish reversible error, an appellant must meet the very high standard of showing that the special master failed to consider relevant evidence, draw plausible inferences, or state a rational basis for his decision. *Hines v. Secretary of HHS*, 940 F.2d 1518, 1528 (Fed.Cir.1991). Anything short of such a showing is unavailing to appellant and requires that the decision of the special master be affirmed.

## II. *Proof of Table Injury*

█ Petitioners bear the burden of proving the existence of a table injury, including the onset of encephalopathy within the statutory time frame followed by death as a sequela. *See Hellebrand v. Secretary of HHS*, 999 F.2d 1565, 1568 (Fed.Cir.1993). "The special master or court may not make such a finding based on the claims of petitioner alone, unsubstantiated by medical records or medical opinion." 42 U.S.C. § 300aa–13(a)(1). The special master found that petitioners had failed to meet this burden even with the affidavit of Dr. Peterson considered in light of all the other evidence presented to the special master. Contrary to petitioners contentions, there were contemporaneous medical records of Curtis' medical condition. Curtis' medical history is documented by the records of the pediatrician at the time of DPT vaccination, the ER during its attempts to revive Curtis, and the autopsy report in investigating the exact cause of death. Mere gaps in Curtis' medical history cannot be cited by petitioners as evidence of respondent's failure to rebut petitioners' case. If anything, they contribute evidence of a lack of medical emergency in Curtis' development, as noted by the special master, and petitioners bear the responsibility for failing to document any contemporaneous emergency medical conditions if any existed. It is clear that the special master gave careful consideration to the parties' testimony and the medical records. This includes the pediatrician's records of Curtis' appetite, ophthalmological and dermatological conditions, crying, and colic during the eleven day time period at issue. *Tr.* at 252–53. Given the well-documented diligence with which petitioners pursued pediatric care for Curtis during the course of his development, it seems highly unlikely, as noted by respondent, that petitioners would have difficulty producing a record of Curtis' medical ailments as described in their testimony prior to his death if they were indeed so severe in nature.

Rather than corroborating petitioners' dramatic accounts of the onset of encephalopathy within 72 hours of vaccination followed by death as a sequela within 11 days, the existing medical records, which contain the observations of petitioners themselves, indicate that Curtis was healthy. The record of discharge at the time of death mentioned neither any parental concern about Curtis' health during the week prior to death nor a request by the parents for an inquiry into the encephalopathic symptoms now alleged. The autopsy report, wherein Mr. Gurr was the primary source of information regarding the deceased's prior medical history, plainly states that Curtis suffered from "no other medical problems," Pet'r's Ex. ("PX") 11 at 2, a fact the special master found particularly "disquieting." *Tr.* at 258. Finally, in the records created by SIDS counselors of the Colorado SIS Program, petitioners mentioned only one illness in the last week of Curtis' life, i.e., "Colicky on breast milk." *Tr.* at 259; Resp't's Ex. ("RX") I at 25. As noted by the special master, these records were devoid of any mention by petitioners of encephalopathic signs or symptoms, which include focal and diffuse signs of neurological distress, increased intercranial pressure, changes in consciousness levels lasting at least six hours with or without convulsions, incessant, inconsolable crying, high-pitched, unusual screaming, episodes of seizure, and bulging fontanel. *See* 42 U.S.C. § 300aa–14(b)(3)(A). This struck the special master as "very disconcerting," *Tr.* at 259–60, and he found unconvincing Mr. Gurr's explanation that had he been asked about Curtis' medial ailments on other occasions when he was not mourning, he would have related Curtis' encephalopathic symptoms.

*Murphy v. Secretary of HHS*, No. 90–882V, slip op., 1991 WL 74931 (Cl.Ct. Spec.Mstr. April 25, 1991), set forth the following standard:

> It has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight.... That rule has been followed in Program cases.... The rule should not be applied blindly, however.... Further, it must be recognized that the absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance. Since medical records typically record only a fraction of all that occurs, the fact that reference to

an event is omitted from the medical records may not be very significant.

*Id.* (citing *Clark v. Secretary of HHS*, No. 90–45V, slip op. at 3, 1991 WL 57051 (Cl.Ct. Spec.Mstr. March 28, 1991)), *aff'd*, 23 Cl.Ct. 726 (1991), *and aff'd*, 968 F.2d 1226 (Fed.Cir. 1992). *Murphy* also stated, however, that:

> To the extent that it interprets the events described by the fact witnesses to have occurred following the vaccinations as constituting compensable injuries, the medical opinion testimony offered by the petitioners does support their claims; *but to the extent that it relies on the testimony of the petitioners' witnesses as to the occurrence and timing of events, it must stand or fall with the fact testimony.*

*Id.* (emphasis added). Based upon his extensive study and recognition that "medical records, in general, warrant consideration as trustworthy evidence" even when they are not always exactly contemporaneous, *Cucuras v. Secretary of HHS*, 993 F.2d 1525, 1528 (Fed.Cir.1993), the special master concluded that the medical records, which were substantially consistent with one another but were inconsistent with petitioners' testimony, greatly outweighed the shred of evidence indicating the existence of a table injury.[4] The special master simply did not believe that Dr. Peterson's claims in his affidavit regarding the changes in Curtis' head circumference and weight were enough corroboration of petitioners' testimony to support a finding of table injury. Thus, the special master rejected petitioners' contention, reiterated during oral arguments, that because the head circumference and weight evidence were not specifically rebutted by respondent's medical experts, that evidence must carry the day. Even if the special master had given greater probative weight to this evidence, it is clear that he nonetheless would have determined that petitioners failed to meet their burden of proof. This determination was reasonable and well within the

special master's discretion. The special master reasonably concluded that petitioners had failed to prove by a preponderance of the evidence Curtis' onset of encephalopathy within 72 hours of DPT vaccination followed by death as a sequela within 11 days. The special master was in a unique and well-suited position to make determinations on the credibility of evidence, *see Burns v. Secretary of HHS*, 3 F.3d 415, 417 (Fed.Cir. 1993); *Hines*, 940 F.2d at 1527, and it is clear that he considered all of the relevant evidence and testimony before him. Therefore, this court finds that the special master did not abuse his discretion or otherwise commit reversible error in ruling that petitioners had failed to establish the onset of a table injury.

### III. *Proof of Causation–in–Fact*

Petitioners set forth the alternative argument that, notwithstanding a finding that there was insufficient evidence of a table injury, the evidence they produced meets the burden of proof for establishing causation-in-fact of injury. Further, petitioners contend that the special master's dismissal of the case came at a procedurally incorrect time since the scope of the October 19, 1995 hearing in Denver, Colorado, was limited to evidence supporting the onset of table injury. Thus, the special master's conclusion that there was insufficient evidence to show causation-in-fact, argue petitioners, was reversible error. Proving causation-in-fact requires proof of actual causation as in traditional tort law wherein petitioners are entitled to no temporal or coincidental presumptions of cause and effect. *Grant v. Secretary of HHS*, 956 F.2d 1144, 1148 (Fed.Cir.1992). Causation-in-fact requires the production of a "medical theory causally connecting the vaccination and the injury. Causation-in-fact requires proof of a logical sequence of cause and effect showing the vaccine was the reason for the injury. A reputable medical or scientific explanation must support this logical sequence of cause

---

4. To the extent the parties have raised any hearsay objections to the admissibility and consideration of evidence, it is well-established that under the Vaccine Act, the formal rules of evidence shall not be interpreted and administered in an unduly restrictive manner in a proceeding before a special master of this court in order to promote the free discovery of relevant facts if doing so will serve the ends of justice and judicial economy. This approach applies to the discretionary admission of hearsay evidence by the special master. *See Matthews v. Secretary of HHS*, 18 Cl.Ct. 514, 520 (1989).

and effect." *Id.; Agarwal v. Secretary of HHS,* 33 Fed.Cl. 482, 487 (1995); *see also Knudsen v. Secretary of HHS,* 35 F.3d 543 (Fed.Cir.1994); *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). If petitioners fail to prove any link in the causal chain by a preponderance of the evidence, their theory of causation must fail. *Grant,* 956 F.2d at 1148.

The cornerstone of petitioners' causation-in-fact argument is that Dr. Peterson's second affidavit is credible and unrebutted. Yet, as respondent states *arguendo,* even if this testimony was found to be uncontradicted, it does not necessarily control and the finder of fact is not required to treat it as binding. *See Van Epps v. Secretary of HHS,* 26 Cl.Ct. 650, 654 (1992). Even if petitioners were to produce unrebutted evidence on one point, they will not necessarily prevail if there is a mountain of evidence against them on every other point. Moreover, it is clear that Dr. Peterson's opinion is hardly unrebutted. Respondent's expert of neuropathology, Dr. Rorke, was in complete agreement with the autopsy report that there was no evidence of encephalopathy or any disease of the central nervous system. RX E. Respondent's expert of pediatric neurology, Dr. Gale, found no evidence of vaccine-related injury or DPT-related death. RX G. Petitioners' bare assertions that Dr. Peterson's affidavit is unrebutted does not withstand scrutiny. The special master gave both of Dr. Peterson's affidavits due consideration and then determined that they were of little probative value. Determinations of credibility, especially of expert opinions, are uniquely within the purview of the special masters. *Burns v. Secretary of HHS,* 3 F.3d 415, 417 (Fed.Cir.1993).

 The special master found that Dr. Peterson's medical opinions were conclusory, were based on only a partial examination of the evidence of weight loss and head circumference, were convincingly rebutted by respondent's medical experts, and relied on the testimony of petitioners in arriving at its conclusions. More importantly, the special master determined that these affidavits neither set forth a credible medical/scientific

theory of cause and effect nor proved by a reasonable degree of medical probability, much less a preponderance of the evidence, that vaccination was the cause-in-fact of Curtis' demise. *Gurr* slip op. at 5. The special master rejected these affidavits as unpersuasive and unconvincing. *Fehrs v. United States,* 223 Ct.Cl. 488, 508, 620 F.2d 255 (1980) (stating that the judgment and credibility of an expert opinion depend on the soundness of the underlying theory supporting it). The special master concluded that petitioners' medical expert's opinion was plagued by gaps in his logic and was unsupported by the totality of evidence on record. *Gurr* slip op. at 5–6. After reviewing that decision, this court concludes that the special master did not err in his dismissal order. Finally, the special master's dismissal was not procedurally premature since petitioners had failed to show cause as to why the causation-in-fact issue should not also be dismissed. Petitioners failed to meet their burden of proof in going forward with the case. Indeed, petitioners did not even raise the issue of causation-in-fact in their October 1, 1990, Petition for Compensation, in which they claimed entitlement to compensation under only a theory of table injury. This court concludes that the special master gave due consideration to the weight of both of Dr. Peterson's affidavits, and, therefore, committed no reversible error. *See Johnson v. Secretary of HHS,* 33 Fed.Cl. 712 (1995).

Petitioners' motion for review is essentially a veiled attempt to convince this court, through relitigation of the same issue, that Dr. Peterson's affidavit is dispositive, despite the special master's determination to the contrary. The special master, however, did not act arbitrarily or capriciously and did not abuse his discretion. Indeed, his dismissal was reasonable and well-supported by careful consideration of all of the relevant evidence. Accordingly, the court concludes that petitioners have failed to show that the special master committed reversible error.

### CONCLUSION

After careful consideration of the oral arguments, briefs, and the applicable law, the court AFFIRMS Special Master Abell's Dis-

missal Order. The Clerk of the Court is directed to enter judgment for respondent. No costs.