Chandria and Lonnie FINLEY, Parents and Next Friends of Dylon Tyler Finley, a minor, Petitioners,

v.

SECRETARY OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.

No. 00–405V.

United States Court of Federal Claims.

Jan. 31, 2003.

Richard Gage, Cheyenne, Wyoming, petitioner.

Joan E. Coleman, U.S. Department of Justice, Washington, D.C., with whom were Rob-

ert D. McCallum, Assistant Attorney General, and Director Helene M. Goldberg, for respondent.

## OPINION

FIRESTONE, Judge.

Pending before the court is petitioners Chandria and Lonnie Finley's motion, on behalf of their son Dylon, for review of Special Master Millman's May 29, 2002 decision dismissing their petition for compensation under the National Vaccine Injury Compensation Act, 42 U.S.C. § 300 aa–10–aa–23 ("Vaccine Act" or "Act"). Petitioners argue that the special master erred when she found that the vaccine did not cause Dylon's epilepsy. Defendant Secretary of Health and Human Services ("government") argues in response that the Special Master's decision that the vaccine did not cause Dylon's epilepsy should be upheld. For the reasons that follow, the decision of the special master is hereby **AFFIRMED**.

## BACKGROUND

### A. Facts

#### 1. Medical Records

The following facts are not contested. Dylon Finley was born on April 10, 1996. On July 11, 1997, at the age of fifteen months, he received the measles-mumps-rubella ("MMR") vaccine. On July 20, 1997, Dylon had a grand mal seizure that lasted approximately three minutes. After the seizure, the hospital reported that Dylon was "alert, playing, acting his usual self, and ate normally during the day." *Finley v. Secretary of Dept. of Health and Human Servs.*, 2002 WL 1488758 (Fed.Cl.) at 1. Dylon had no history of seizures, nor was there any family history of seizures.

Dr. Ashakiran Sunku, a pediatric neurologist, later recorded that Dylon's first seizure was associated with a raised temperature and that it was a generalized tonic-clonic [1] seizure

with no focal onset.[2] He also noted that Dylon was postictally tired for two hours and developed a rash and lymphadenopathy [3] three days later. According to Dr. Sunku, all of these symptoms were attributed to post-measles syndrome.

Ms. Finley stated that Dylon had a low-grade fever the morning of his first seizure. At Parkview Episcopal Medical Center on that same day, Dylon's temperature was 101.3 at 7:35 p.m. and 99.9 at 9:35 p.m. On July 21, 1997, the day after his first seizure, an EEG performed on Dylon was "essentially normal." *Id.* However, Ms. Finley stated that Dylon became more aggressive and developed problems with his fine and gross motor skills after the vaccine.

According to the medical records, on June 26, 1998, separate from receiving any vaccine, Dylon had another seizure. It was later described by Dr. Sunku, in his records, as a tonic-clonic, "short-lived seizure" accompanied by a rash. *Id.* Dylon's temperature was 102.6 rectally.

The records reveal that Dylon had a third seizure on February 11, 1999, approximately eighteen months after his first seizure, which lasted thirty-four minutes. In contrast to the first two seizures, no fever accompanied this seizure. Dylon's physical examination, motor exam, sensory exam, deep tendon reflexes (DTRs), and tone taken at that time were normal.

Dylon had further seizures during April and May of 1999 that were not accompanied by fevers. Dylon's new pediatric neurologist, Dr. Brian E. Grabert, diagnosed Dylon with primary generalized epilepsy on May 11, 1999. Dr. Grabert performed a neurological exam on Dylon that same day that indicated he was normal. The records state that Dylon began taking Depakote in August 1999 to control his seizures. It is not disputed that Dylon has been free of seizures since he began taking the Depakote.

---

1. A seizure marked by muscle rigidity (tonic phase) followed by violent, rhythmic convulsions (clonic phase).

2. Focal onset is when the seizure activity in the brain begins in one area of the brain and then spreads over other areas.

3. Enlarged lymph follicles.

On January 27, 2000, more than two years after the MMR vaccine, Dylon was diagnosed with a moderate phonological delay during a speech-therapy evaluation and was recommended for weekly therapy sessions for six months. Dylon had a total of thirteen seizures with some speech problems. On June 14, 2000, Dr. Michael T. Rendler, the family physician, noted that Dylon's first seizure and consequent seizure disorder were the result of the MMR. On June 16, 2000, Dr. Silviano L. Arguello, a pediatrician in practice with Dr. Rendler, noted that Dylon had a history of seizures beginning on July 20, 1997, secondary to the MMR vaccine.

## 2. The Evidentiary Hearing

On July 10, 2000, the petitioners filed a petition for compensation under the Vaccine Act, as parents and next friends of their son, Dylon, claiming that his epilepsy and subsequent speech impediment were caused by the MMR vaccination administered on July 15, 1997. In the petition, petitioners alleged that Dylon experienced an encephalopathy,[4] a Table injury under the Vaccine Act, within

the Table period established pursuant to that Act, and that epilepsy occurred as a proximate and direct result. See 42 U.S.C. § 300aa–14(a). In opposition, the government contended that the medical documentation in the case failed to support the petitioners' claim.

On October 5, 2001, the special master held an evidentiary hearing to determine if the petitioners should succeed on the merits. Testifying for the petitioners, the special master heard from Dr. Michael T. Rendler, Dylon's family physician, and Dr. Brian E. Grabert, Dylon's treating pediatric neurologist. Dr. Russell Snyder, a faculty member of the neurology department at the University of New Mexico who is board-certified in pediatrics and neurology with a specialty in child neurology, testified for the government.

During the evidentiary hearing, Dr. Rendler testified that Dylon was normal before the MMR shot. He described Dylon's seizures but admitted that he had never witnessed the seizures himself. Dr. Rendler testified that Dylon has a minor speech delay

---

4. (2) Encephalopathy. For purposes of the Vaccine Injury Table, a vaccine recipient shall be considered to have suffered an encephalopathy only if such recipient manifests, within the applicable period, an injury meeting the description below of an acute encephalopathy, and then a chronic encephalopathy persists in such person for more than 6 months beyond the date of vaccination.

(i) An acute encephalopathy is one that is sufficiently severe so as to require hospitalization (whether or not hospitalization occurred). (A) For children less than 18 months of age who present without an associated seizure event, an acute encephalopathy is indicated by a "significantly decreased level of consciousness" ... lasting for at least 24 hours. Those children less than 18 months of age who present following a seizure shall be viewed as having an acute encephalopathy if their significantly decreased level of consciousness persists beyond 24 hours and cannot be attributed to a postictal state (seizure) or medication.

\* \* \* \* \* \*

(E) The following clinical features alone, or in combination, do not demonstrate an acute encephalopathy or a significant change in either mental status or level of consciousness as described above: Sleepiness, irritability (fussiness), high-pitched and unusual screaming, persistent inconsolable crying,

and bulging fontanelle. Seizures in themselves are not sufficient to constitute a diagnosis of encephalopathy. In the absence of other evidence of an acute encephalopathy, seizures shall not be viewed as the first symptom or manifestation of the onset of an acute encephalopathy.

(ii) Chronic encephalopathy occurs when a change in mental or neurologic status, first manifested during the applicable time period, persists for a period of at least 6 months from the date of vaccination. Individuals who return to a normal neurologic state after the acute encephalopathy shall not be presumed to have suffered residual neurologic damage from that event; any subsequent chronic encephalopathy shall not be presumed to be a sequela of the acute encephalopathy. If a preponderance of the evidence indicates that a child's chronic encephalopathy is secondary to genetic, prenatal or perinatal factors, that chronic encephalopathy shall not be considered to be a condition set forth in the Table.

(iii) An encephalopathy shall not be considered to be a condition set forth in the Table if in a proceeding on a petition, it is shown by a preponderance of the evidence that the encephalopathy was caused by an infection, a toxin, a metabolic disturbance, a structural lesion, a genetic disorder or trauma (without regard to whether the cause of the infection, toxin, trauma, metabolic disturbance, structural lesion or genetic disorder is known).

and that his last seizure was August 4, 1999, but that Dylon is still on anti-convulsants.

Dr. Grabert testified that because the MMR was responsible for causing Dylon's first seizure it was also responsible for triggering Dylon's epilepsy. Dylon, according to Dr. Grabert, has one seizure disorder that accounts for all of his seizures, both those accompanied by a fever and those that were not; the lengthy time between some of the seizures was not of great importance.[5]

Dr. Grabert testified that Dylon must have an underlying encephalopathy (a Table Injury) because Dylon's first two seizures were triggered by low fevers, indicating a low seizure threshold. Dr. Grabert relied on the definition of encephalopathy that reads "any significant acquired abnormality of injury or impairment of function of the brain with or without inflammatory response." Transcript at 55 (quoting R.E. Weibel, et al., *Acute Encephalopathy Followed by Permanent Brain Injury or Death Associated with Further Attenuated Measles Vaccines: A Review of Claims Submitted to the National Vaccine Injury Compensation Program*, 101 *Pediatrics* 3:383–387 (1998)). He stated that he also equates epilepsy with encephalopathy. However, in response to the special master inquiring if Dylon had an encephalopathy on the date of his first seizure, Dr. Grabert responded, "No."[6] *Id.* at 63. He also testified that a speech problem is common in epileptics.

During direct questioning by the special master and cross-examination, Dr. Grabert stated that it was a "possibility" that the MMR caused Dylon's epilepsy. *Id.* at 76. The only risk factor that Dr. Grabert could identify to cause the encephalopathy (which he equates with epilepsy) is the MMR. However, Dr. Grabert stated that most pediatric neurologists do not believe that febrile seizures[7] cause future epilepsy. He also agreed that most febrile seizures are benign, not associated with brain damage or acute deterioration of cognitive abilities, and common between the ages of six months and three years. He agreed that epidemiological data does not find a causal association between febrile seizures and epilepsy.

Dr. Grabert also testified, during cross examination, that Dylon would still have been diagnosed with epilepsy even if he had never received the MMR.[8] He stated that Dylon's third seizure, approximately eighteen months after his first seizure, was different than his prior episodes in that it was longer, accompanied by a fever, and began with prolonged staring followed by tonic-clonic activity. Dr. Grabert attributed Dylon's third seizure to strobe lights at a hockey game or a strobe-light effect from playing on a trampoline.

Notes by Dr. Grabert concerning Dylon's initial office visit indicated that Dylon did not have symptomatic epilepsy[9] but had primary generalized epilepsy[10] that appears to be of a genetic origin. Dr. Grabert stated that if he had seen Dylon on the date of his first seizure, he would have called it a febrile seizure, but that in retrospect, armed with the information he now has, he would change his diagnosis to epilepsy triggered by fever.

---

5.  Dr. Grabert testified that "[t]he old adage that seizures beget seizures which means they become closer intervals between the first and second and the second and third seizure has really been disproven by lots of studies .... [Y]ou do see kids who have seizures at closer intervals, but that's neither the rule nor is it something that I expect to see to diagnose epilepsy." *Id.* at 48.

6.  Dr. Grabert responded somewhat differently to a similar question put forth by the government. Dr. Grabert responded that "We can't document [the encephalopathy] based upon the ... MRI or imaging studies." *Id.* at 84. Dr. Grabert never retracted his first answer.

7.  Febrile seizures are seizures accompanied by fever.

8.  Similarly, when asked the same question again by the government, Dr. Grabert replied, "Yeah, if he never had an MMR and had seizures, yes, he would have been diagnosed with epilepsy. But I don't think you can subtract the MMR and say for certainty he would have had seizures. That's taking away the one risk factor we have." *Id.* at 86.

9.  Symptomatic epilepsy is epilepsy caused by an injury to the brain.

10.  Generalized epilepsy, or generalized onset, is when the seizure activity begins on both sides of the brain at once.

For the government, Dr. Snyder testified that the MMR did not cause Dylon's epilepsy. Dr. Snyder testified that Dylon has a probable genetic predisposition to epilepsy, and that all of the seizures were products of this predisposition. He agreed with Dr. Grabert to the effect that Dylon has one seizure disorder that has caused all of his episodes. However, he testified that while the MMR caused the first seizure by inducing the fever, the MMR did not cause the subsequent seizures, epilepsy, or Dylon's speech impediment. In other words, Dr. Snyder stated that he does not believe that the subsequent seizures were a sequela or a consequence of the first MMR-induced febrile seizure. Dr. Snyder agreed with Dr. Grabert that Dylon would have had epilepsy even without receiving the MMR.

Dr. Snyder testified that Dylon's speech disorder was caused by the same brain disorder that caused his seizures. Dr. Snyder highlighted the fact that febrile seizures do not cause epilepsy and that there was no evidence that he had a brain injury at the time of his first seizure. He stated that if Dylon's first seizure was more than just a simple febrile seizure, then "he would have been very sick afterwards [and] had a neurology consult at that time." *Id.* at 111.

Dr. Snyder testified that Dylon's non-focal, tonic/clonic seizures "argue against him having symptomatic epilepsy." *Id.* He also stated that there may be a genetic cause to the seizures as demonstrated by the kind of seizures Dylon experienced. He further stated that a genetic cause is likely because Dylon's EEGs have been normal, Tegretol made the symptoms worse, and Dylon responded negatively to strobe lights. During direct examination, Dr. Snyder testified that genetic epilepsy is often without an identifiable cause: "But that's true of most of the genetic epilepsy, that we don't know what specifically is causing it, what gene is out of line." *Id.* at 129.

During cross examination, Dr. Snyder was asked if an entire seizure disorder could have been caused by the MMR. Dr. Snyder responded, "That could happen if the child following the MMR in the time frame had an encephalopathic response. Not a simple febrile seizure." *Id.* at 124. The special master inquired as to whether Dr. Snyder equated "seizure disorder" with "encephalopathy." Dr. Snyder responded, "No, I'm not using those as equal terms." *Id.* at 124.

The government submitted various articles and chapters out of medical texts that describe studies that demonstrated that febrile seizures are benign and rarely lead to epilepsy.[11] The government also filed a statement by Dr. Weibel, author of the article upon which the petitioners relied, who stated that Dylon did not fit within the definition of "encephalopathy" upon which he relied in his study, indicating that the petitioners' use of his article was misplaced.

### 3. The Special Master's Decision

On May 29, 2002, the special master issued a decision denying the petitioners' request for compensation. Specifically, the special master found Dr. Snyder's testimony more credible and that the petitioners "have failed to prove a prima facie case that Dylon's MMR injury lasted more than six months and caused his current condition." *Finley,* 2002 WL 1488758 at *11. The special master concluded that the MMR had not caused a sequela from the first seizure that lasted more than six months, as required by the Vaccine Act. Specifically, she found that "Dylon's epilepsy onset was not diagnosed until his third seizure, ... which occurred seven and one-half months after his second seizure and one and one-half years after his first seizure. Even his third seizure, according to Dr. Grabert ... and Dr. Snyder ... did not cause him harm." *Id.* at *9. The special master pointed to the fact that "Dylon's epilepsy is generalized, not symptomatic .... The absence of focal injury means no brain

---

11. W.E. Barlow, et al., *The Risk of Seizures After Receipt of Whole-Cell Pertussis or Measles, Mumps, and Rubella Vaccine,* 345 New England Journal of Medicine 9:656–61 (2001); A.T. Berg, et al., *Childhood-onset Epilepsy with and without Preceding Febrile Seizures,* 53 Nuerology 1742–48 (1999); S. Shinnar, *Febrile Seizures,* in *Pediatric Neurology, Principles & Practice,* 3d ed. (K.F. Swaiman and S. Ashwal eds., 1999); P.R. and C.S. Camfield, *Pediatric Epilepsy: An Overview,* in *Pediatric Neurology, Principles & Practice,* 3d ed. (K.F. Swaiman and S. Ashwal eds., 1999).

insult." *Id.* The special master found that Dr. Grabert's opinion, based on the fact that the MMR was the only risk factor, was an insufficient legal basis to find for the petitioners. She cited that " 'evidence showing an absence of other causes does not meet petitioners' [sic] affirmative duty to show actual or legal causation.' " *Id.* at *10 (citing *Grant v. Secretary of Dept. of Health and Human Servs.*, 956 F.2d 1144, 1149 (Fed.Cir. 1992)). The special master also found that Dr. Grabert, in fact, had concluded that there were other risk factors, "because something in Dylon's brain is abnormal or he would not have had a fever-induced seizure with such a low temperature." *Id.* Dr. Grabert's opinion that the MMR "possibly" caused Dylon's epilepsy and speech deficit was not enough.

The special master found that Dr. Rendler could not provide a credible basis for his opinion that the MMR caused the epilepsy because he lacks expertise in pediatric neurology. Finally, the special master thought it was significant that both Dr. Grabert and Dr. Snyder believed that Dylon would have had epilepsy even without the MMR. The special master concluded that:

> Dylon does have only one seizure disorder. The experts agree on this. But [the] MMR caused only the first seizure, which had no residua. Both Dr. Grabert and Dr. Snyder testified that Dylon had an underlying brain disorder which caused him to seize the first two times with low grade temperature. The brain disorder caused his epilepsy. Dr. Grabert testified that Dylon's seizures did not harm his brain. The only reasonable assumption as to the cause of Dylon's speech deficit is that same underlying brain disorder, which accords with Dr. Snyder's opinion.

*Id.* at *11.

On June 26, 2002, Mr. and Ms. Finley filed a motion for review of the Special Master's decision in this court. The government filed its memorandum in response to petitioners' motion for review on July 26, 2002.

## DISCUSSION

### I. Standard of Review

The Vaccine Act states that:

> [T]he United States Court of Federal Claims shall have jurisdiction to undertake a review of the record of the proceedings [before the special master] and may thereafter–
>
> (A) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,
>
> (B) set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or
>
> (C) remand the petition to the special master for further action in accordance with the court's discretion.

42 U.S.C. § 300aa–12(e)(2) (1994 and Supp. 1997).

The court in *Carraggio v. Secretary of Dept. of Health and Human Servs.*, 38 Fed. Cl. 211 (1997), explained the three distinct levels of review in a Vaccine Act case:

> Fact findings are reviewed under the arbitrary and capricious standard. Legal questions are reviewed under the 'not in accordance with law' standard, and discretionary rulings are reviewed under the abuse of discretion standard.

*Id.* at 217 (quoting from *Perreira v. Secretary of Dept. of Health and Human Servs.*, 27 Fed.Cl. 29, 32 (1992), *aff'd*, 33 F.3d 1375 (Fed.Cir.1994)); *see also* 42 U.S.C. § 300aa–12(e)(2)(B).

■ Under these well-settled standards, this court will not reverse the decision of a special master unless the special master failed to consider relevant evidence, drew implausible inferences, or failed to state a rational basis for the decision. *See Gurr v. Secretary of Health and Human Servs.*, 37 Fed.Cl. 314, 317 (1997) (citing *Hines v. Secretary of Dept. of Health and Human Servs.*, 940 F.2d 1518, 1528 (Fed.Cir.1991)).

### II. *Burden of Proof*

Under the Vaccine Act, petitioners have the burden of demonstrating by a preponder-

ance of the evidence that Dylon's injury was caused by his MMR vaccination. *See* 42 U.S.C. § 300aa–13(a)(1)(A). Petitioners may do this by proving that the child suffered an injury listed on the Table within the Table's prescribed time periods. *See id.* § 300aa–14. Petitioners also must show that the injury occurred as a sequela of that injury or condition. *See Carraggio,* 38 Fed.Cl. at 219. "[I]f a petitioner can show by a preponderance of the evidence, that a table injury was sustained within the required time period, then there is a presumption that the petitioner is entitled to compensation ...." *Id.* at 218; *see* 42 U.S.C. § 300aa–13(a)(1)–(2). These findings may not be based on the claims of the petitioners alone. Rather, they must be substantiated by medical records or by medical opinion. *See* 42 U.S.C. § 300aa–13(a)(1). The preponderance of evidence standard has been explained as more than a probability. *See Centmehaiey v. Secretary of Dept. of Health and Human Servs.,* 32 Fed.Cl. 612, 621, *aff'd,* 73 F.3d 381 (Fed.Cir.1995).

After petitioners have met their prima facie case of a Table injury under the Act, the government can rebut the presumption of a Table injury by demonstrating, by a preponderance of the evidence, that the illness or death was caused by factors unrelated to the administration of the vaccine. *See* 42 U.S.C. § 300aa–13(a)(1)(B); *see also Carraggio,* 38 Fed.Cl. at 222. The Vaccine Act states that a "factor unrelated" does not include "any idiopathic, unexplained, unknown, hypothetical, or undocumentable cause, factor, injury, illness, or condition." *Id.* § 300aa–13(a)(2)(A). It may, however, include:

> infection, toxins, trauma ..., or metabolic disturbances which have no known relation to the vaccine involved, but which in the particular case are shown to have been the agent or agents principally responsible for causing the petitioner's illness, disability, injury, condition, or death.

*Id.* § 300aa–13(a)(2)(B). This list is not meant to be all-inclusive. *See Hanlon v. Secretary of Health and Human Servs.,* 40 Fed.Cl. 625, 631 (1998). Indeed, factors unrelated "may include certain conditions listed, but also may include some other condition which is not listed, so long as that other condition has 'no known relation to the vaccine involved, but which in the particular case [is] shown to have been the agent ... principally responsible for causing' the vaccine's injury." *Id.* (quoting 42 U.S.C. § 300aa–13(a)(2)(B)) (alteration in original).

## III. The Special Master's Decision is Not Contrary to Law

### 1. The Special Master gave proper consideration to Dylon's susceptibility to epilepsy

■ At the core of petitioners' motion for review is their claim that the special master incorrectly took into consideration Dylon's predisposition to epilepsy in her decision. Petitioners argue that Dylon's underlying condition is immaterial. Petitioners contend that because the special master had to take the plaintiff as she found him, she should not have considered evidence of some pre-existing cause for Dylon's epilepsy. The government agrees that under the Vaccine Act, the special master must take the plaintiff as she finds him and that if any special factors placed the vaccine recipient at special risk, the government is still liable. According to the government, however, the special master properly considered Dylon's predisposition to epilepsy in this case. Her decision reflects her conclusion that the cause of Dylon's epilepsy was the underlying condition itself and that the vaccine was not a substantial factor in bringing about the epilepsy. *See Shyface v. Secretary of Health and Human Servs.,* 165 F.3d 1344, 1352 (Fed.Cir.1999).

■ The court agrees that the special master had sufficient evidence to find that the MMR did not cause Dylon's seizure disorder. The testimony of Dr. Snyder supports her conclusion that Dylon's epilepsy was not caused by the MMR. The fact that the MMR triggered an epileptic episode does not mean it triggered the epilepsy itself. The record shows that at the time of his MMR, Dylon had a fever but no evidence of an encephalopathy. Instead, Dylon had the markings of a genetic cause to his epilepsy. The facts presented by the expert testimony of Dr. Snyder all support the special master's conclusion. Therefore, petitioners' objections to the special master's consideration of

Dylon's predisposition to epilepsy does not provide a basis for reversing her decision.

In these circumstances, petitioners' attempt to equate this case with *Costa v. Secretary of Dept. of Health and Human Servs.* is misguided. 1992 WL 47334 (Cl.Ct.), *vacated by* 26 Cl.Ct. 866 (1992), *remanded to* 1992 WL 365421. Costa, the petitioners assert, stands for the proposition that because the "defendant takes his victim as he finds him" in tort law, it must be true that an "[a]ggravation of a preexisting condition can be an 'injury' under the Act." *Id.* at *15–16. That principle only applies when "the vaccine was a substantial factor in bringing about the injury." *Shyface*, 165 F.3d at 1353. *Shyface* and *Costa* are consistent with the special master's conclusion that if the condition would occur without the vaccine and the vaccine simply triggered an episode of the condition without causing permanent harm, then the court may not find that the vaccine was responsible for causing the underlying condition.

### 2. The Special Master's reliance on Dr. Snyder's testimony was not arbitrary or capricious

██ Petitioners argue that the special master's decision should also be reversed on the grounds that it was arbitrary and capricious. In particular they charge that she improperly held Dr. Grabert to a "higher, non-legal, scientific level of proof," a level far beyond what is required by the Act. By holding the petitioners' expert to such a level, the petitioners argue that the special master "offered an explanation for [her] decision that runs counter to the evidence . . . [and] is so implausible that it could not be ascribed to a difference in view or the product of [her] expertise." Petitioners' Memorandum of Objections at 15 (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). Petitioners argue that had the special master given Dr. Grabert the proper deference they should have prevailed.

The government argues that the petitioners' objections to the special master's findings are "mere disagreement[s] with her fact findings." Government's Memorandum at 5. The government maintains that the special master credited their expert, Dr. Snyder, and rejected the petitioners' experts. Dr. Snyder was a qualified witness with opinions fully backed by medical literature, which does not make the special master's decision arbitrary and capricious.

The court agrees with the government that, the special master's decision to reject Dr. Grabert's opinions in favor of Dr. Snyder's was not arbitrary or capricious. In addition, the court finds that Dr. Snyder's testimony was sufficient to support the special master's decision. Dr. Grabert's contention that the MMR "possibly" caused Dylon's epilepsy was not legally sufficient. In addition, his concession that Dylon would have had epilepsy even without the MMR plainly failed to satisfy the plaintiffs' burden of proof. The fact that Dr. Snyder failed to give a name for the underlying cause of the epilepsy that led to Dylon's seizures did not render his testimony unpersuasive. To the contrary, in keeping with the requirements of the Vaccine Act, Dr. Snyder expressed little doubt that Dylon's MMR shot was not the *cause* of Dylon's epileptic condition. Dr. Snyder stated that, based on a reasonable degree of medical probability, the MMR vaccine did not cause a permanent brain injury or that the subsequent seizures were a sequela of any such injury. While Dr. Snyder could not pinpoint the exact cause of Dylon's epilepsy, he was not required to do so. It was enough for Dr. Snyder to opine based on the evidence presented (see p. 356, *supra*) that the cause of Dylon's epilepsy and speech problems was not the MMR.

### CONCLUSION

For the forgoing reasons, the court **DENIES** petitioners' motion for review and **AFFIRMS** the May 29, 2002 decision of the special master.[12] The clerk of the court is directed to enter judgment accordingly.

---

12. In view of the foregoing, petitioners' motion for entry of judgment filed on December 23, 2002 is denied as moot.